IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 02-40-M-DWM |
| | ) | CR-10-27-M-DWM |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS OF FACT & |
| | ) | CONCLUSIONS OF LAW |
| NATHAN KEKOA SOUZA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant Nathan Kekoa Souza is accused in an Amended Consolidated

Petition of three violations of the terms and conditions of his supervised release.

The Defendant contests alleged Violation No. 1, but does not contest alleged

Violation Nos. 2 and 3. Following a revocation hearing held pursuant to Rule

32.1(b)(2), Fed. R. Crim. P., the Court now issues these Findings of Fact and

Conclusions of Law in support of the judgment entered in this matter in open court

on September 28, 2011.

## FINDINGS OF FACT

1.     Defendant Souza was charged under case number CR 02-40-M-DWM with possession with intent to distribute methamphetamine (Count II) and possession of a firearm during a drug-trafficking crime (Count III).  After entering a guilty plea, Souza was sentenced to 135 months in prison on Count II and a consecutive 60 months in prison on Count III, for a total sentence of incarceration of 195 months, followed by five years of supervised release.

2.     On September 4, 2004, the Defendant's custody sentence in CR 02-40-M-DWM was reduced to 72 months pursuant to the government's motion for a reduction in sentence under Rule 35(b), Fed. R. Crim. P., based on the Defendant's substantial assistance.

3.     On January 12, 2007, the Defendant's custody sentence in CR 02-40-M-DWM was further reduced to 60 months, based on a second Rule 35(b) motion by the government, acknowledging additional substantial assistance from the Defendant.

4.     The Defendant was released from custody and began his five-year term of supervision on January 20, 2007.

5.     The Defendant has at all times been supervised by United States Probation Officer Joseph McElroy.

6.      On July 11, 2007, Officer McElroy filed a Petition alleging Defendant

Souza had violated his supervised release by visiting a bar and consuming alcohol.

The Defendant admitted to the violation, and the Court gave him the opportunity

to undergo an inpatient treatment program.  After the Defendant successfully

completed the program and secured employment, the Court dismissed the Petition

and allowed the Defendant to continue on supervision.

7.      On April 10, 2008, Officer McElroy filed a Petition reporting that he had

conducted a home visit and obtained a urine sample from the Defendant, which

tested positive for cocaine.  Consistent with Officer McElroy's recommendation,

the Court took no action at that time.

8.      The Defendant tested positive for cocaine again on July 21, 2008, and

admitted cocaine use to Officer McElroy on that date.  The Court revoked the

Defendant's supervised release, and sentenced him on October 22, 2008, to 12

months in prison on Count II in CR 02-40-M-DWM, to be followed by up to 180

days at a residential re-entry center on Count III in CR 02-40-M-DWM.  The

Court also imposed a sentence of 54 months on supervised release.

9.      On September 12, 2009, the Defendant escaped from the residential re-entry

center in Gillette, Wyoming.  He was charged with escape in the District of

Wyoming and sentenced to eight months in prison and three years of supervised

release.  The Defendant discharged his custody sentence on the escape charge and began his term of supervised release on June 24, 2010.

10.     Jurisdiction over the Defendant's supervision on the escape charge was transferred to this Court on July 14, 2010, under the case number CR 10-27-M-DWM.

11.     On July 22, 2010, the Defendant tested positive for alcohol consumption in violation of the terms of his supervision.  On October 18, 2010, the Defendant failed to contact Officer McElroy as instructed.  On October 20, 2010, the Defendant refused Officer McElroy's instruction that he submit a urine sample.  Officer McElroy reported the violations in an Amended Petition dated October 20, 2010.  The Defendant admitted the violations on October 28, 2010, and the Court released the Defendant to a 60-day inpatient treatment program, to be followed by placement in a residential re-entry center for 180 days.  Following his successful completion of both programs, the Defendant was allowed to continue on supervised release on July 28, 2011.

12.     In July 2011, Defendant Souza secured employment at the Army/Navy store in downtown Missoula.

13.     Defendant Souza was hired by Jessie Sullivant, a long-time acquaintance who was then the manager at Army/Navy.

14.    Jessie Sullivant testified at the hearing.  He responded to questions directly and candidly, and admitted to past false statements made in connection with the investigation of the violation conduct.  He also disclosed prior criminal convictions and a pending criminal proceeding against him.  Jessie Sullivant was a very credible witness.

15.    In exchange for his truthful cooperation with the investigation of this matter, Jessie Sullivant received immunity from federal prosecution for his involvement with the Defendant in August 2011.

16.    During their employment at Army/Navy, the Defendant told Sullivant that he could arrange for Sullivant to purchase automobiles, firearms, electronics, marijuana, and cocaine at discounted prices.

17.    Sullivant found the Defendant's boast credible because the Defendant had recently acquired a 1994 Cadillac Deville, despite having no apparent financial resources or income beyond his wages at Army/Navy.

18.    The Defendant had purchased the Cadillac from Mike Ferguson, a long-time friend of the Defendant.  The purchase price was $200.00.  The Cadillac was not mechanically sound, and needed a tire repair, among other problems.

19.    Mike Ferguson testified at the hearing.  He was a credible witness.

20.    Sometime near the beginning of the third weekend of August, 2011, the

Defendant provided Jessie Sullivant and Sullivant's friend and roommate at the time, Nathaniel "Nat" Hood, with an ounce of marijuana on a "front." To Sullivant and Hood, this was further proof that Souza had connections through which he could obtain drugs and other items for sale at discounted prices.

21.     Nathaniel "Nat" Hood testified at the hearing. Hood's testimony was believable in most respects. Hood is unemployed, does not maintain a fixed address, and has a history of dealing marijuana. Hood admitted to two past criminal convictions for possession of marijuana, as well as a pending proceeding against him for allegedly vandalizing cars while intoxicated.

22.     In exchange for his truthful cooperation with the investigation of this matter, Nathaniel "Nat" Hood  received immunity from federal prosecution for his involvement with the Defendant in August 2011.

23.     Sullivant and Hood each maintain a social relationship with Nick Childs, a student at the University of Montana who is originally from Minnesota.

24.     Nick Childs testified at the hearing. His testimony was candid and credible.

25.     In exchange for his truthful cooperation with the investigation of this matter, Nick Childs received immunity from federal prosecution for his involvement with the Defendant in August 2011.

26.     Childs had been in contact with two friends of his from Minnesota, Sam

Waters and Robert "Tref" Strandberg. Waters and Strandberg asked Childs if he could arrange for them to purchase a large quantity of marijuana in Missoula. Waters and Strandberg believed that the price for marijuana was lower in Montana, and hoped to return to Minnesota and distribute the marijuana for profit.

27.    On or about August 20, 2011, Childs contacted Hood, whom Childs knew to be an occasional marijuana dealer, and inquired as to whether Hood knew of an opportunity to purchase several pounds of marijuana. Hood, who together with Sullivant had recently been fronted an ounce of marijuana by the Defendant, told Childs that the Defendant could broker such a sale.

28.    Upon hearing this news from Hood, Childs instructed Waters and Strandberg to begin driving to Missoula from Minnesota.

29.    On Sunday, August 21, 2011, Childs and Hood met with the Defendant at the Army/Navy store to discuss the marijuana transaction. They agreed that later that day, after the Defendant finished his shift at Army/Navy, Childs' associates would buy between 4½ and 6 pounds of marijuana in exchange for $10,400.00 in a cash transaction brokered by the Defendant.

30.    Also on August 21, 2011, the Defendant found a purse in the back of the Army/Navy store. The purse had been mistakenly left in the store the previous day by customer Danita Lampe. The purse contained Lampe's EBT card, social

security card, debit card, University of Montana Griz card, and driver's license, along with $250.00 in cash.

31.    Danita Lampe testified at the hearing.  Her testimony was credible.

32.    Upon discovering the purse, the Defendant brought it to the front of the store, where Sullivant and store owner Jim McGuirl were present.

33.    Jim McGuirl testified at the hearing.  His testimony was candid and credible.

34.    McGuirl instructed Sullivant and the Defendant to locate contact information for the owner of the purse.  McGuirl placed the purse behind the cash register in a manner that would make the purse visible to patrons, and then left the store for the day.

35.    The Defendant told Sullivant he was considering taking the money from the purse and using it to pay for repairs to the tire on his Cadillac.  Sullivant advised the Defendant against taking the money, noting that McGuirl had likely counted the money and would know if any money was removed.  In fact, McGuirl had not counted the money.

36.    Sullivant and the Defendant did not identify the owner of the purse during their shift on Sunday, August 21, 2011.

37.    Sullivant and the Defendant closed the store at the end of their shift and

rode together to Sullivant's residence to meet with Hood, Childs, Waters and Strandberg.

38.     Waters and Strandberg had arrived in Missoula earlier in the day from Minnesota.  Between them they had gathered $10,400.00 in cash, which they carried in a backpack that also contained Strandberg's clothes.

39.     At Sullivant's residence, the Defendant stated the transaction would occur at another location, and that only one person could bring the purchase money and accompany the Defendant to the location.  Strandberg was chosen to ride with the Defendant and conduct the transaction.

40.     The Defendant drove Strandberg to a trailer park east of Missoula.  Once there, the Defendant parked near the back side of a trailer, so that the entrance to the trailer was not in view.  The Defendant told Strandberg the exchange would not occur in plain view, and that it would be necessary for the Defendant to first take the money into the trailer.  Strandberg gave the Defendant the backpack containing the money, and the Defendant walked around the trailer and went inside.

41.     After several minutes, the Defendant returned to the vehicle and told Strandberg to enter the trailer to retrieve his backpack, which would presumably contain the marijuana.

42.     Strandberg walked around the trailer to the entrance, but before going inside he heard the Defendant hurriedly driving away.  At that point Strandberg concluded the drug transaction was a ruse and the Defendant had stolen the $10,400.00 in purchase money.

43.     The following day, Monday, August 22, 2011, Sullivant went to work at Army/Navy.  Jim McGuirl came to the store that morning and saw that the purse was gone.  He asked Sullivant what happened to purse, and Sullivant said he did not know.  The two made repeated attempts to contact the Defendant to ask him about the purse's whereabouts, but were not successful.

44.     On Tuesday, August 23, 2011, Danita Lampe returned to Army/Navy looking for her purse.  McGuirl told her the purse had been removed from the store, and accompanied her to the police station to file a report.

45.     Also on August 23, 2011, the Defendant visited a car dealership owned and operated by Farhad Khameneh.  The Defendant was accompanied by Mike Ferguson.  The purpose of the visit was for the Defendant to purchase a sports car.

46.     Farhad Khameneh testified at the hearing.  He was a credible witness.

47.     Ferguson test drove several cars, and the Defendant eventually chose to buy a black 1992 Mitsubishi 3000 for the negotiated price of $6,000.00.  The purchase price was paid in cash, which came from the Defendant.

48.     The Defendant told Khameneh that he wanted the vehicle titled in Ferguson's name because the Defendant had child support obligations and he did not want the purchase to become known to his probation officer.

49.     On the evening of August 23, 2011, the Defendant visited Jim McGuirl at his home and told McGuirl he was giving two weeks notice of his plans to leave his employment at Army/Navy.  The Defendant arrived at McGuirl's house driving a black sports car.

50.     McGuirl asked the Defendant about the purse, and in response the Defendant told McGuirl to ask Sullivant what happened to the purse.

51.     The Defendant never returned to work at Army/Navy after his conversation with McGuirl that evening.

52.     On Wednesday, August 24, 2011, police officers visited the Army/Navy store looking to arrest Jessie Sullivant on outstanding warrants for failure to appear.  McGuirl was at the store when the police arrived.

53.     McGuirl called Sullivant at his home and told Sullivant he wanted to meet with Sullivant because the Defendant had told McGuirl to question Sullivant about the purse.  McGuirl stated he believed either Sullivant or the Defendant had taken the purse.  McGuirl did not mention the police or the warrants.

54.     Sullivant told McGuirl he would come to the store, but it would take an

hour because Sullivant did not have a vehicle. McGuirl agreed to drive to Sullivant's home to pick him up.

55.     Sullivant, upset that the Defendant had implicated him in the disappearance of the purse, decided to disclose to McGuirl the Defendant's theft of Strandberg's drug money. Sullivant chose to disclose the Defendant's theft to McGuirl for the dual purposes of clearing his own name with respect to the purse and also seeking retribution against the Defendant for the theft of drug money.

56.     Sullivant enlisted the help of his roommate, Hood, in concocting a story that would accuse the Defendant of theft without revealing that associates of Sullivant and Hood had engaged in an attempt to purchase a distributable quantity of marijuana. The two agreed on a story that had Hood attempting to buy a car from the Defendant for $3,200.00. When Hood produced the money, the story went, the Defendant pulled a knife, stole Hood's money, and threatened to kill Hood if he went to the police.

57.     Hood agreed to go along with the story for the sole purpose of clearing Sullivant's name with respect to the disappearance of the purse, apparently expecting that the story would convince McGuirl that the Defendant had a propensity to steal, and thus that it was more likely that the Defendant, and not Sullivant, had taken the purse.

58.     When McGuirl arrived to pick up Sullivant, Hood joined them and they

traveled to the Army/Navy store.  Sullivant and Hood told McGuirl the fabricated

account of the Defendant robbing Hood during the sale of an automobile.

59.     Sullivant was arrested on outstanding warrants at the Army/Navy store, and

spent the next 13 days in jail.

60.     Upon hearing Sullivant's denial of involvement in the purse theft and the

fabricated tale of robbery, McGuirl called the police and reported the theft of the

purse.  He then gave the phone to Hood and insisted that Hood tell the police story

of the robbery by the Defendant during a car sale.

61.     Sometime later, a recorded phone conversation between Hood and an

incarcerated Sullivant revealed to Officer McElroy that the robbery story was

fabricated.  Officer McElroy then determined through investigation that the

Defendant had taken $10,400.00 from Strandberg during a purported marijuana

transaction.

62.     At all times during the foregoing events, Sullivant, Hood, and Childs were

regular and frequent users of marijuana.

63.     On August 22, 2011, the Defendant registered the Cadillac in his name.  He

paid $72.36 in cash for the registration fees.

64.     On August 23, 2011, the Defendant paid $41.77 in cash for items purchased

at Home Depot in Missoula, and $107.69 in cash for items purchased at Walmart in Missoula.

65.     On August 24, 2011, the Defendant paid $251.50 for items purchased at Walmart in Missoula.

66.     On August 24, 2011, the Defendant paid $1,250.00 to cover one month's rent and a security deposit for a new apartment he planned to share with Ferguson and another person.  Ferguson and the other roommate contributed a total of $800.00.  The Defendant contributed the remaining $450.00.

67.     Sometime in late August 2011, the Defendant visited Keri Cardinal, the mother of his youngest child, and asked her to hold $1,990.00 in cash for him. Cardinal was suspicious of the Defendant's possession of cash in that amount, but stated that she did not want to know how he got it.  He responded that he did not want to tell her.

68.     Keri Cardinal testified at the hearing.  Most of her testimony was credible, although she appeared at times to choose her words in a manner that she expected would benefit the Defendant.

69.     Officer McElroy arrested the Defendant on August 25, 2011.  When he was arrested, the Defendant had $134.00 in cash in his possession.  Officer McElroy observed a tire in the trunk of the Defendant's Cadillac that appeared to have been

recently repaired.

70.     Taken together, the foregoing events and transactions indicate that the
Defendant was in possession of at least $9,047.32 in cash between August 22,
2011, and August 25, 2011.

71.     The Defendant's only income during the period in question was a paycheck
from Army/Navy in the amount of $279.28.  He received another paycheck for
$384.83, but McGuirl directed that a stop payment be placed on that check, and
the check never cleared with Army/Navy's bank.  A third paycheck for $75.48
remains at Army/Navy and has not been picked up by the Defendant.

72.     The Defendant stole Danita Lampe's purse and its contents from the
Army/Navy store.

73.     The Defendant stole $10,400.00 in cash from Robert "Tref" Strandberg and
Sam Waters.

74.     The Defendant used the proceeds from his thefts to make purchases and
conduct transactions as described above.

75.     On August 16, 2011, Officer McElroy instructed the Defendant not to make
any purchases without Officer McElroy's approval.  Officer McElroy did not
approve any of the purchases described above.

76.     The Defendant distributed an ounce of marijuana to Jessie Sullivant and Nat

Hood.

77. The Defendant owes outstanding child support balances for at least three of his minor children, totaling at least $5,092.87.

78. A statutory condition of the Defendant's supervised release provides, "While on Supervised release, the defendant shall not commit another Federal, state, or local crime."

79. Standard Condition No. 3 of the Defendant's supervised release states, "The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer."

80. Standard Condition No. 4 of the Defendant's supervised release states, "You shall support your dependents and meet other family responsibilities.

81. The Defendant suffers from mental illness requiring medication and has struggled with substance abuse.

82. The Court, the United States Attorney's Office, and in particular Officer McElroy, have gone to great lengths provide the Defendant with the support and opportunities he needs to succeed on supervision.

83. The Defendant has twice received residential inpatient treatment at the government's expense. The government has also paid for two outpatient chemical dependency treatment programs.

84.     The Defendant has received or is currently receiving the assistance of the following agencies: Western Montana Mental Health Center, Turning Point Addiction Services, Department of Family Services, Courage to Change, Western Montana Addiction Services, Office of Public Assistance, Connections Corrections, Butte Residential Re-entry Center, Volunteers of America, Gillette, WY, Residential Re-entry Center.

85.     Between incarceration, supervision, testing, and treatment, the government has spent a combined $199,342.19 on the Defendant.

86.     The efforts of the Court, the United States Attorney's Office, the supporting agencies, and the considerable efforts of Officer McElroy to encourage and coerce the Defendant to perform well on supervision have failed.

87.     The Defendant has demonstrated a propensity and a willingness to commit crimes than cannot be curbed by any combination of treatment and supervision.

88.     The Defendant poses a great threat to the public and his presence in the community exposes innocent victims to further criminal conduct by the Defendant.

89.     The Defendant needs educational and vocational training and medical and mental health treatment.  Those opportunities can be provided to him in a Bureau of Prisons facility.

90.     Placement in a Bureau of Prisons facility will deter further criminal conduct

by the Defendant.

CONCLUSIONS OF LAW

1.     Violations of supervised release must be found by a preponderance of the evidence.  18 U.S.C. § 3583(e)(3).

2.     The Federal Rules of Evidence do not apply to a revocation hearing.  Fed. R. Evid. 1101(d)(3).

3.     Pursuant to Mont. Code Ann. § 45-6-301(1)(b), "A person commits the offense of theft when the person purposely or knowingly obtains or exerts unauthorized control over property of the owner and purposely or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property."

4.     Pursuant to Mont. Code. Ann. § 45-6-301(2)(a), "A person commits the offense of theft when the person purposely or knowingly obtains by threat or deception control over property of the owner and has the purpose of depriving the owner of the property."

5.     The offense of theft is a misdemeanor if the value of the property stolen does not exceed $1,500.00.  If the value of the stolen property is greater than $1,500.00, the offense is a felony.  Mont. Code. Ann. § 45-6-301(8).

6.     The Defendant's theft of Danita Lampe's purse is a misdemeanor under

Mont. Code Ann § 45-6-301(1)(b).

7.     The Defendant's theft of $10,400.00 from Sam Waters and Robert "Tref" Strandberg is a felony under Mont. Code Ann § 45-6-301(2)(a)

8.     It is a federal felony under 21 U.S.C. § 841(a)(1) & (b)(1)(D) to distribute marijuana.

9.     The Defendant committed a felony under 21 U.S.C. § 841(a)(1) & (b)(1)(D) when he gave Sullivant and Hood an ounce of marijuana on a "front."

10.    By committing felony and misdemeanor theft under Montana law, and felony distribution of marijuana under federal law, the Defendant violated the statutory condition of his supervised release that provides, "While on Supervised release, the defendant shall not commit another Federal, state, or local crime."

11.    The Defendant is guilty of Violation No. 1 alleged in the Amended Consolidated Petition.

12.    By failing to follow the instructions of Officer McElroy with regard to new purchases, the Defendant has violated Standard Condition No. 3 of his supervised release, and is therefore guilty of Violation No. 2 alleged in the Amended Consolidated Petition.

13.    By failing to support his dependents and meet his family responsibilities, including payment of child support, the Defendant has violated Standard

Condition No. 4 of his supervised release, and is therefore guilty of Violation No.

3 alleged in the Amended Consolidated Petition.

14.     Under U.S.S.G. § 7B1.4(a)(2), the policy statement range for imprisonment

upon revocation of the supervised release for Counts II and III in CR 02-40-M-

DWM is 30 to 37 months.

15.     Under U.S.S.G. § 7B1.4(a)(2), the policy statement range for imprisonment

upon revocation of the supervised release for Count I in CR 10-27-M-DWM is 46

to 57 months.

16.     The ranges set forth in U.S.S.G. § 7B1.4 are not binding on the Court.

Chapter 7 of the United States Sentencing Guidelines sets forth policy statements

rather than guidelines, and contain only recommendations from which the

sentencing court has the discretion to deviate.  <u>United States v. Spangle</u>, 626 F.3d

488, 498 (9th Cir. 2010).  The sentencing court must give due consideration to the

policy statements in arriving at a reasonable sentence.  18 U.S.C. §§ 3583(e),

3553(a)(5).

17.     The statutory maximum sentence of imprisonment upon revocation of the

supervised release for Counts II and III in CR 02-40-M-DWM is 60 months.  18

U.S.C. §§ 3583(e)(3).

18.     The statutory maximum sentence of imprisonment upon revocation of the

supervised release for Count I in CR 10-27-M-DWM is 24 months. 18 U.S.C. §§ 3583(e)(3).

19. The Court, after giving consideration to the factors set forth in 18 U.S.C. § 3553(a), is authorized to impose multiple terms of imprisonment consecutively. 18 U.S.C. § 3584; United States v. Jackson, 176 F.3d 1175 (9th Cir. 1999) (per curiam).

20. Application Note 4 to U.S.S.G. § 7B1.4 states, "Where the original sentence was the result of a downward departure (e.g., as a reward for substantial assistance), or a charge reduction that resulted in a sentence below the guideline range applicable to the defendant's underlying conduct, an upward departure may be warranted."

21. Application Note 4 to U.S.S.G. § 7B1.4 applies when a defendant's initial sentence of incarceration is not the result of a downward departure, but is subsequently reduced on the government's motion under Rule 35(b), Fed. R. Crim. P. See United States v. Hergott, 562 F.3d 968 (8th Cir. 2009); United States v. Moore, 443 F.3d 790 (11th Cir. 2006).

22. The Defendant objected at the revocation hearing that consecutive sentences of incarceration would violate the United States Supreme Court's decision in Apprendi v. New Jersey, 445 F.3d 1220 (2004). The Ninth Circuit has rejected

this argument because 1) supervised release is part of the original sentence and is not additional punishment, and 2) the revocation of supervised release and the imposition of additional imprisonment "is, and always has been, fully discretionary[.]" United States v. Huerta-Pimental, 445 F.3d 1220, 1223-24 (9th Cir. 2006).

23.　The Defendant objected at the revocation hearing that consecutive sentences of incarceration are illegal under 18 U.S.C. § 3624(e) and Johnson v. United States, 529 U.S. 694 (2000).  The Ninth Circuit squarely rejected this argument in United States v. Xinidakis, 598 F.3d 1213 (9th Cir. 2010).

24.　As required by 18 U.S.C. § 3583(e), the Court has considered the following § 3553(a) factors in arriving at an appropriate sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar

conduct; and

(7) the need to provide restitution to any victims of the offense.

25.    A sentencing court is required to state in open court the reasons for imposition of a particular sentence if that sentence differs from the range recommended in the applicable policy statement.  United States v. Miqbel, 444 F.3d 1173, 1181 (9th Cir. 2006); 18 U.S.C. § 3553(c)(2).

26.    Having considered the relevant § 3553(a) factors, and in light of all of the Findings of Fact set forth herein, and in particular the Findings of Fact at Paragraphs 81-90, a sentence of 18 months imprisonment on Count II in CR 02-40-M-DWM, 42 months imprisonment on Count III in CR 02-40-M-DWM, and 24 months imprisonment on Count I in CR 10-27-M-DWM, all to be served consecutively, for a total of 84 months imprisonment, is reasonable and is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a)(2)(B)-(D).

Dated this 4th day of October, 2011.


_____
DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT